UNITED STATES of America ex rel
Mary L. HOLMES, Plaintiff–
Appellant,

and

United States of America,
Movant–Appellee,

v.

CONSUMER INSURANCE GROUP;
John Hightower, Defendants.

No. 01–1077.

United States Court of Appeals,
Tenth Circuit.

Feb. 19, 2002.

Craig D. Joyce, Walters & Joyce, P.C., Denver, CO, appearing for Appellant.

Charles W. Scarborough, United States Attorney, Appellate Staff Civil Division, Department of Justice, (Stuart E. Schiffer, Acting Assistant Attorney General, United States Department of Justice, Office of Immigration Litigation, Washington, DC, Richard T. Spriggs, United States Attorney, Office of the United States Attorney, Denver, CO, and Douglas N. Letter, United States Attorney, Appellate Staff Civil Division, Department of Justice, Washington, DC, with him on the brief), appearing for Appellee.

Before TACHA, Chief Judge, GARTH * and BRISCOE, Circuit Judges.

TACHA, Chief Circuit Judge.

Appellant Mary L. Holmes filed this action against Consumer Insurance Group under the *qui tam* provision of the False Claims Act, 31 U.S.C. § 3730. The United States moved to dismiss Holmes from the suit under Federal Rule of Civil Procedure 12(b)(1). The district court granted the motion and entered judgment against Holmes pursuant to Federal Rule of Civil Procedure 54(b). Holmes appealed. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. Background

Mary L. Holmes is postmaster at the United States Post Office in Poncha

---

* The Honorable Leonard I. Garth, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

Springs, Colorado. In October of 1995, Holmes responded to an inquiry by employees of Consumer Insurance Group ("CIG") about a bulk mailing. The CIG employees informed Holmes that CIG was receiving the per pound bulk postal rate at the post office in Howard, Colorado. After confirming this information with the postmaster in Howard, Holmes granted CIG's request for the per pound rate. Upon further investigation, however, Holmes determined that CIG did not qualify for the rate, because the pieces in its mailings did not satisfy minimum weight requirements. Holmes therefore informed CIG that it could not take advantage of the per pound rate. She also informed the postmaster in Howard that CIG was not entitled to this rate.

Almost two years later, in August of 1997, Holmes was at the Howard post office to provide postmaster training. At that time, she asked the current postmaster whether CIG was receiving the per pound bulk rate, and she learned that it was. Holmes informed her superior and, later, the Office of the Inspector General and a postal systems coordinator (an auditor) that CIG was defrauding the Postal Service by providing false information in order to obtain a lower postal rate. The Postal Inspection Service initiated an investigation and later turned the case over to the U.S. Attorney. The government's investigation of CIG included interviews with one current and two former CIG employees. In those interviews, the government revealed its suspicions, although it later became clear that the interviewees were already aware of the fraud. In August 1998, the Postal Service commended Holmes's efforts with a letter of appreciation and a $500 award.

On April 2, 1999, Holmes filed suit against CIG under the False Claims Act ("FCA"). The FCA authorizes a person to bring a civil action, called a *qui tam* action, against those who defraud the government. 31 U.S.C. § 3730(b). A *qui tam* plaintiff, or relator, brings the action in the name of the government, and the government may elect to intervene. *Id.* § 3730(b)(1)-(2). The relator is entitled to a portion of the proceeds recovered in the action or settlement. *Id.* § 3730(d).

Following Holmes's initiation of this case against CIG, the government moved to dismiss her for lack of subject matter jurisdiction. The government asserted that its disclosure of the fraud allegations to three current and former CIG employees during its investigation constituted "public disclosure."[1] The government further argued that Holmes was not an "original source" and therefore could not avoid the public disclosure bar.[2] The district court granted the motion, but it did so without employing the public disclosure analysis. Instead, the district court concluded that the government's ongoing investigation of the fraud allegations precluded Holmes's suit. The district court

---

**1.** The statute provides:
No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

**2.** For purposes of the public disclosure bar, " 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).

therefore dismissed Holmes from the suit. Holmes appealed.

## II. Discussion

Holmes argues that the district court improperly dismissed her from the suit, because an ongoing investigation does not bar a *qui tam* action, and because there had been no public disclosure of the allegations or transactions at issue. We hold that the district court erred in reasoning that the government's ongoing investigation of the fraud allegations precludes Holmes's suit, but that its dismissal of Holmes from the case was nevertheless correct.

■ In our prior cases dealing with *qui tam* actions by current or former federal employees, the public disclosure bar precluded the action. As a result, we have not previously defined the extent to which government employees may or may not qualify as *qui tam* plaintiffs when the public disclosure bar does not apply. *United States ex rel. Fine v. MK–Ferguson Co.,* 99 F.3d 1538, 1541 n. 1 (10th Cir.1996); *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1003 n. 1 (10th Cir.1996). We have held that "public disclosure occurs only when the allegations or fraudulent transactions are affirmatively provided to others not previously informed thereof." *United States ex. rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1521 (10th Cir.1996). It is undisputed that the current and former employees whom the government interviewed in its investigation of CIG had prior knowledge of the fraud. The government's disclosure of information to them was therefore not "public" within the meaning of the

FCA. As a result, we cannot rely on the public disclosure bar here and must squarely address the question of federal employees' eligibility to file *qui tam* suits under the FCA. Based on our examination of the statute and its purposes and federal employees' obligations to avoid conflicts of interest, we hold that Holmes was not a proper *qui tam* plaintiff. A person who, pursuant to duties as a government employee, is part of an ongoing government investigation of fraud allegations may not pursue a *qui tam* suit based on those allegations.

The First and Eleventh Circuits have split on this question, with the First Circuit finding no jurisdiction and the Eleventh Circuit reaching the opposite result. *United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1496 n. 7, 1502 (11th Cir.1991); *United States ex rel. LeBlanc v. Raytheon Co.,* 913 F.2d 17, 20 (1st Cir. 1990). Our approach differs from that of each of these circuits, and we discuss the significant differences below.[3]

### A. Standard of Review

The district court treated the motion to dismiss for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), as a motion to dismiss under Rule 12(b)(6). This is appropriate when the jurisdictional issue arises from the statute that creates the cause of action. *Ramseyer,* 90 F.3d at 1518. Because the court relied on affidavits and other evidence, however, the motion should have been treated as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), and we therefore consider the motion on review as one for summary judgment. *Id.*

**3.** The Sixth Circuit has noted this issue but has not specifically resolved it. *Burns v. A.D. Roe Co.,* 186 F.3d 717, 722 & n. 5 (6th Cir. 1999) (declining to address the government's argument that government employees are precluded from filing *qui tam* suits, but noting that no court has taken this position). The

court did, however, remand for new analysis under the public disclosure bar based on evidence that the relator, who was a government employee, did not receive information pursuant to FOIA requests until after he filed suit. *Id.* at 726.

We review de novo an order of summary judgment, applying the same standard as the district court must apply under Rule 56(c). *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir.1995). Accordingly, we consider whether, viewing the facts in the light most favorable to the nonmoving party, there is any issue of material fact that, if resolved in Holmes's favor, would allow her to prevail. *Id.*

We also review de novo an issue of subject matter jurisdiction. *United States ex rel. Precision Co. v. Koch Indus.*, 971 F.2d 548, 551 (10th Cir.1992). Federal courts have limited jurisdiction, and we therefore presume that there is no jurisdiction unless the party invoking it makes an adequate showing that it exists. *Id.* at 551. The party seeking to invoke federal jurisdiction bears the burden of alleging and proving by a preponderance of the evidence the facts necessary to support jurisdiction. *Id.*

## B. *The Ongoing Investigation*

■ The district court reasoned that the government's ongoing investigation demonstrated that the government was capable of pursuing the allegations without the assistance of the relator. The court therefore held that allowing a *qui tam* suit would not serve the purposes of the FCA and dismissed Holmes from the suit. Our examination of the FCA, its 1986 amendments, and Tenth Circuit case law leads us to conclude that an ongoing government investigation is not a per se bar to a *qui tam* suit.

Prior to 1986, the FCA required a court to dismiss an action that was based on information the government possessed when the action was brought, unless the government elected to proceed with the action. 31 U.S.C. § 3730(b)(4) (superceded). The Act further provided that, if the government elected to proceed with an action, the person initiating the action "may receive an amount the court decides is reasonable for disclosing evidence or information the Government did not have when the action was brought." *Id.* § 3730(c)(1) (superceded). A *qui tam* relator, in other words, could only recover a portion of the proceeds due to the government if the relator had provided new information.

In 1986, Congress amended the *qui tam* provisions. The current version of the statute does not require that the relator provide information that the government does not already possess. Instead, Congress has provided that there is no jurisdiction over a relator's suit that is "based upon the public disclosure of allegations or transactions ... in a congressional, administrative, or Government Accounting Office report, hearing audit, or investigation ... unless the person bringing the action is an original source of the information." 31 U.S.C § 3730(e)(4)(A). This jurisdictional inquiry requires us to answer four questions: (1) Are the allegations or transactions contained in one of the listed sources? (2) Have the allegations or transactions been "publicly disclosed"? (3) Is the suit "based upon" the public disclosure? (4) If the answer to the first three questions is affirmative, can the relator qualify as an "original source" and therefore escape the jurisdictional bar? *MK-Ferguson Co.*, 99 F.3d at 1544. A negative answer to any of the first three questions means that the *qui tam* action may proceed. The last question is only asked if the first three questions are all answered affirmatively.

The fact that a government investigation contains the allegations in Holmes's complaint means that the answer to the question in step (1) is "yes." This does not, however, end the inquiry. To hold that an ongoing investigation alone is a per se jurisdictional bar would ignore the four-

step approach created in *MK–Ferguson* and would eviscerate the public disclosure bar's remaining three steps, which are firmly grounded in the statutory language. Moreover, "[n]ot requiring some positive act of disclosure would reinstate the pre 1986 jurisdictional bar based on mere 'government knowledge' of information pertaining to fraud." *United States ex rel. Fine v. MK–Ferguson Co.*, 861 F.Supp. 1544, 1551 (D.N.M.1994), *aff'd*, 99 F.3d 1538 (10th Cir.1996), *quoted with approval in Ramseyer*, 90 F.3d at 1520.

We also find unpersuasive the district court's reliance on our reference in a prior case to "Congress' 'twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.' " *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir.1995) (quoting *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 651 (D.C.Cir.1994)). In that case, these goals of the FCA informed our interpretation of "the public disclosure of allegations or transactions" and when a *qui tam* action is "based upon" that disclosure. *Id.* at 571–72. We decline to extend *Sandia*'s rationale, which we used as an aid to understanding specific statutory phrases, to reach a result that contradicts the plain meaning of the public disclosure bar and the purposes it evidences.

We therefore conclude that the district court erred in concluding that an ongoing government investigation bars a *qui tam* action. We normally would proceed under *MK–Ferguson* to answer the remaining three questions and, because there has been no public disclosure, we would find jurisdiction. For the reasons below, however, we hold that the specific circumstances of this case—where a government employee pursues a qui tam action during an ongoing investigation—gives rise to a different inquiry.

### C. Examination of the Specific Circumstances

■ We may affirm the district court's decision "on any ground adequately supported by the record." *Z.J. Gifts D–2, L.L.C. v. City of Aurora*, 136 F.3d 683, 685 (10th Cir.1998). We therefore consider whether the specific circumstances in this case preclude jurisdiction over Holmes's claim.

As an initial matter, we note that the FCA does not, by its terms, either authorize or preclude all suits by government employees.[4] One of the specific exclusions prevents suits "by a former or present member of the armed forces ... against a member of the armed forces arising out of such person's service in the armed forces." 31 U.S.C. § 3730(e)(1).[5] Another exclusion precludes a *qui tam* suit "against a Mem-

4. Nor, as the dissent points out, does the legislative history make clear whether Congress intended to permit federal employees to act as *qui tam* relators.

5. This provision is the only indication we have found that Congress specifically contemplated *qui tam* suits by federal employees. Interestingly, though, this provision addresses an "insider's" action—an action by an individual who learned in the course of employment (or, more specifically here, military service) of a colleague's fraud or complicity in a private company's or individual's fraud. An insider's action represents the most typical

"whistleblower" suit, and it is insider whistleblowers who most likely fear retaliation when they act as informers. It may well be that Congress intended to permit *qui tam* actions by government employees who discover fraudulent activity by or with the complicity of their co-workers or superiors, just as Congress aimed to provide incentives for insiders in the private sector to reveal fraud by their employers. We certainly do not intend to imply that every plaintiff—or even every plaintiff who is a government employee—must be an insider in order to proceed with a *qui tam* action under the FCA. The distinction between insider and non-insider *qui tam*

ber of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought." *Id.* § 3730(e)(2)(A). In effect, this section might preclude government employees from filing *qui tam* suits against individuals in the named categories, based on the argument that, if a government employee has the information, the government also has it. If government employees were always precluded from pursuing *qui tam* suits under the FCA, these specific exclusions would be superfluous. We therefore avoid such an interpretation. *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1285 (10th Cir.2001).

■ Although we decline to apply a general jurisdictional bar to federal employees, this conclusion does not necessarily mean that federal employees are *always* proper *qui tam* plaintiffs unless section 3730(e) bars jurisdiction. We therefore consider whether a federal employee who is part of an ongoing government investigation may proceed with a *qui tam* suit based on those allegations. We conclude that a federal employee may not proceed with a *qui tam* suit in these circumstances.

The FCA provides, in a section headed "Actions by private persons," that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). The Act does not make explicit the class of "persons" eligible to file civil suits under subsection (b). In construing a statute, "our overriding purpose

is to determine congressional intent." *Chickasaw Nation v. United States*, 208 F.3d 871, 878 (10th Cir.2000) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)). To determine the statute's plain meaning, we "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *Id.* (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)). Based on our examination of the FCA and its purposes, along with our consideration of federal employees' obligations to avoid conflicts of interest, we conclude that a federal employee who participates in a government investigation pursuant to her job duties is not, as least while the investigation is ongoing, a "person" entitled to bring a civil action under section 3730(b).

We acknowledge that, in reaching this conclusion, we take a position that conflicts directly with the Eleventh Circuit's view. That court has held that a former government employee is not barred from pursuing a *qui tam* action based upon information he acquired during the course of his government employment, regardless of whether the government is engaged in an active investigation of the alleged fraud. *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1496 n. 7, 1502 (11th Cir.1991). Our approach is quite different from that of the *Williams* court. The Eleventh Circuit focused its analysis on the public disclosure bar, *id.* at 1499–1500, and extra-statutory arguments against jurisdiction, *id.* at 1501–04. In contrast, we

plaintiffs, however, is a significant one with respect to what Congress may have contemplated and intended. Nothing in the statute or the legislative history suggests to us that Congress intended to permit all non-insider actions by government employees. For the reasons we outline in this opinion, we conclude that § 3730 does not authorize Holmes's non-insider action in the particular

circumstances of this case. We reiterate, though, that we do not have occasion here to define every situation when a government employee may or may not pursue a *qui tam* action. Unless and until Congress decides to clarify the statute, of course, we may find ourselves faced with other cases that demand further definition of these limits.

start with the FCA's initial grant of jurisdiction and conclude that not all government employees fall within the group of "persons" otherwise eligible to file a *qui tam* action. Much of the Eleventh Circuit's reasoning addresses the FCA's failure to preclude *all* government employees' *qui tam* actions. It is our view, however, that while the Act does not explicitly authorize or preclude all such actions, it may allow some and disallow others. In determining which government employees are excluded from the category of eligible plaintiffs, we consider the employee's duties and whether there is an ongoing government investigation. We conclude that allowing a *qui tam* action to proceed where the relator is a government employee acting as part of an ongoing investigation[6] would destroy the statute's distinction between the government and relator, would contravene the purpose of the FCA, and would create impermissible conflicts of interest for federal employees pursuing such suits.

### 1. The Separation Between the Government and a Potential Relator

We first observe that the concept of a *qui tam* action assumes a distinction between the government and the individual *qui tam* plaintiff. When the FCA permits a private suit, the person filing it brings the action "for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). The term "qui tam" derives from the Latin phrase, "qui tam pro domino rege quam pro se ipso in hac parte sequitur," which means "who as well for the king as for himself sues in this matter." Black's Law Dictionary 1262 (7th ed.1999). This distinction between relator and government is not present, however, when a federal employee obtains information about fraud in the pursuit of his or her particular duties as a government employee. In effect, that person obtains the information *as* the government. At least with respect to an ongoing government investigation, a federal employee who is involved in the investigation pursuant to employment duties *is* the government. Therefore, we hold that such an employee cannot file an action under section 3730(b) "for the person and for the United States Government."[7]

Holmes is such an employee in this case. Holmes first encountered the CIG employees in her capacity as postmaster at the

---

**6.** It is beyond the scope of this opinion to delineate the precise bounds of when a federal employee is part of a government investigation because, in this case, the relator was clearly reporting fraud pursuant to her specific government duties.

**7.** Interestingly, our conclusion here echoes the First, Ninth, and Eleventh Circuits' rejection of a "dual status" argument in the context of the public disclosure bar. In cases before those courts, the government asserted that a government employee who uses government information for private purposes has thereby "publicly disclosed" this information to himself in his private capacity. *Williams,* 931 F.2d at 1499–1500; *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1419–20 (9th Cir.1991) ("*Hagood I* "); *LeBlanc,* 913 F.2d at 20. In the First Circuit's words, this argument "requires the assumption that government employees lead schizophrenic lives." *LeBlanc,* 913 F.2d at

**20.** The Ninth Circuit called the proposition "too metaphysical a contention for the interpretation of a plain congressional statement." *Hagood I,* 929 F.2d at 1419. Similarly, we reject the notion that an employee in Holmes's position can assume dual roles and act as a *qui tam* plaintiff for herself and the government. As a federal employee who is part of an ongoing investigation, Holmes is confined to her role as the government with respect to that investigation.

As the dissent acknowledges, our analysis does not rely upon the section 3730(b)'s heading, "Actions by private persons." We agree with the dissent that such statutory titles and headings generally have marginal interpretive value. We note simply that, if one were to rely upon this heading, it would not necessarily compel the all-or-nothing conclusion that the dissent would draw from it. Rather, it would be quite plausible to interpret this phrase to permit some actions by government

post office in Poncha Springs, Colorado. To determine whether CIG was entitled to the bulk rate it sought, she consulted with the postmaster at Howard, where CIG was supposedly receiving that rate. Though the Howard postmaster confirmed that CIG got the bulk rate, Holmes ultimately denied CIG that rate, based on her determination that the mailing did not meet weight requirements. It is undisputed that, at all times during this progression of events, Holmes acted in her capacity as postmaster.

Several years later, Holmes went to the Howard post office to provide training to the acting postmaster. It is undisputed that Holmes undertook this task within the scope of her employment as a postmaster. Holmes states in her affidavit that she provided this training with the approval of her manager, and her complaint states that she was "assigned temporarily to the Howard post office." She makes no claim that the training itself was outside the scope of her employment. The affidavit of Marsha Boyle, a labor relations specialist who serves as a representative and advisor to the U.S. Postal Service, states that, under Postal Service regulations, "postmasters may be designated and certified as postmaster trainers."

Holmes states in her affidavit that, during lunch with the acting postmaster when she was in Howard to provide training, she asked about CIG's bulk rate and learned that it was getting the rate she had denied it two years earlier. She and the acting postmaster discussed the matter and together examined CIG's latest mailing statement. Holmes claims that she had

"no other business than curiosity to inquire about" the rates CIG was getting at the Howard post office, and that she had no authority over the Howard office and had not been assigned to check into bulk mailings. Even if she had no specific duty to inquire ask about CIG's rates, however, she made the inquiry and obtained the relevant information in her capacity as postmaster.

Moreover, Holmes had a duty as a postmaster to report information about this type of fraud. Regulation 224.3 in the Postal Service's Administrative Support Manual requires a postmaster to report by memorandum "[f]ailure to pay postage, violation of franking privilege, misuse of penalty mail, depositing of advertising material in mailboxes without payment of postage, *and similar schemes to evade payment of postage.*" (Emphasis added). Holmes does not dispute that this regulation applies to her. Nothing in the regulation limits its scope, and Holmes has provided no evidence to suggest that its scope is limited to fraud conducted or discovered at her home post office.[8] In fact, she concedes its applicability when she states in her brief that she "could have met her job description responsibility to report suspected fraud by simply sending a memorandum to the Postal Inspection Service."

Holmes argues that she did more than what was required of her. We are not persuaded. According to her affidavit, Holmes first reported the fraud to her superior after her trip to Howard in August 1997, rather than immediately submitting a written memorandum to her local postal inspector in charge, as the postal

employees (for example, actions based on information acquired independently and not through the individual's government employment, or insider actions against other government employees), while precluding others (for example, non-insider actions based on information obtained in the course of government employment).

8. Moreover, Boyle's affidavit specifically states that a postmaster who is acting as a postmaster trainer "is not relieved of his responsibilities as a postmaster, as they pertain to reporting fraud."

regulations require. In December 1997, she had not yet heard anything about an investigation by the postal inspectors. She therefore sent a letter to the Inspector General's office. In early March 1998, the Inspector General's office notified Holmes by letter that it had "reviewed the information" and "referred [her] concerns to the appropriate Office of Inspector General Director for action deemed warranted." Holmes had "little confidence that anything would be done," and she therefore told a postal systems coordinator about the fraud allegations. Soon after, however, an agent from the Inspector General's office contacted Holmes about its investigation. This course of events, as described by Holmes, demonstrates that, while she certainly reported the information, she did not follow the procedure outlined in the postal regulations. Moreover, it is undisputed that, when it became aware of the fraud allegations, the Postal Inspection Service investigated them. Thus, we cannot find that Holmes's actions so exceeded her duties as to entitle her to pursue a *qui tam* action.

Inasmuch as Holmes's duties as a federal employee are an important element in our analysis, our reasoning bears some similarity to the First Circuit's reasoning in *United States ex rel. LeBlanc v. Raytheon Co.*, 913 F.2d 17, 20 (1st Cir.1990). We emphasize, however, that our approach differs significantly from the First Circuit's. The *LeBlanc* court held that a government employee who has a duty, as "a condition of his employment, to uncover fraud" does not qualify as a *qui tam* relator, because this duty prevents him from qualifying as an "original source." *Id.* at 20. In contrast, we find it unnecessary to reach the original source question where there has been no public disclosure.[9] Instead, our analysis revolves around the meaning of Congress's statement that "[a]

---

9. Before conducting the original source inquiry, the *LeBlanc* court appears to have concluded that there had been no public disclosure. 913 F.2d at 20. The First Circuit did not explicitly state this conclusion, though it did explicitly reject the district court's basis for finding public disclosure. The district court's rationale was that the relator, having acquired the information as a government employee, disclosed it to himself as a private person. *U.S. ex rel. LeBlanc v. Raytheon Co.*, 729 F.Supp. 170, 175 (D.Mass.1990). The First Circuit specifically rejected this "dual status" argument. *LeBlanc*, 913 F.2d at 20. It further held that the filing of a *qui tam* action itself is not a public disclosure. *Id.* The circuit court did not, however, specify what facts *supported* a finding of public disclosure in LeBlanc's case. The Eleventh Circuit, too, has read *LeBlanc* as holding that there had been no public disclosure. *Williams*, 931 F.2d at 1500 n. 13. Although the Tenth Circuit does not address the original source question unless there has been a public disclosure, *see Ramseyer*, 90 F.3d at 1522 n. 6, *LeBlanc* suggests that the First Circuit has taken a different view, at least with respect to federal employees.

We see only one other plausible interpretation of the *LeBlanc* opinion. The First Circuit's only indication of why the public disclosure bar might have applied to LeBlanc is its statement that the bar "does not prevent government employees from bringing *qui tam* actions based on information acquired during the course of their employment *but not* as the result of a government hearing, investigation or audit or through the news media." *LeBlanc*, 913 F.2d at 20 (emphasis added). Thus, if the court in fact concluded that there had been a public disclosure, it must have been because the relator—a former quality assurance specialist for the Government Defense Contract Administrative Service—acquired his information from one of these sources. When it considered the original source exception, the court held that a government employee whose job entailed a specific duty to uncover fraud could not qualify as an original source: "It was LeBlanc's responsibility, a condition of his employment, to uncover fraud. The fruits of his effort belong to his employer—the government. Thus, LeBlanc was not someone with 'independent knowledge of the information' as required by the statute." *Id.* Therefore, even if *LeBlanc*

person may bring a civil action … for the person and for the United States Government," 31 U.S.C. § 3730(b)(1), an issue that logically precedes the public disclosure and original source inquiries. A federal employee who is not precluded for the reasons we outline in this opinion would still be subject to the public disclosure bar, and if public disclosure had occurred, there would be no jurisdiction unless the employee could qualify as an original source.

### 2. The Purposes of the FCA and the 1986 Amendments

The purposes of the FCA's *qui tam* provisions and its 1986 amendments further support our conclusion that jurisdiction is lacking. "Congress instituted the *qui tam* provisions of the FCA to encourage private citizens to expose fraud that the government itself cannot easily uncover." *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 572 (10th Cir.1995). Moreover, the 1986 amendments' expansion of jurisdiction over *qui tam* actions reflects Congress's "concern that the government was not pursuing known instances of fraud." *Ramseyer*, 90 F.3d at 1520 (quoting *MK–Ferguson Co.*, 861 F.Supp. at

1551). The statute as amended aims "(1) to encourage private citizens with first-hand knowledge to expose fraud; and (2) to avoid civil actions by opportunists attempting to capitalize on public information without seriously contributing to the disclosure of the fraud." *Id.* at 1519–20 (quoting *Precision*, 971 F.2d at 552). The "public disclosure" bar manifests and serves these purposes by requiring that, if information exists in one of the enumerated sources, and if that information has been publicly disclosed, only an original source of the information may sue. Consideration of the circumstances at issue here reveals several reasons that exercising jurisdiction would not serve the FCA's purposes of encouraging exposure of fraud or preventing parasitic suits.

First, where a government employee has a duty to report fraud, as Holmes does as postmaster, the information underlying that employee's suit does not constitute information that the government would not otherwise uncover. The duty to report itself assures that her information is the government's information. Thus, this is a case of fraud allegations that the government *is capable of pursuing.*[10]

---

requires a finding of public disclosure as a prerequisite to the original source inquiry, the First Circuit's reasoning arguably produces the same result in Holmes's case as we have reached here.

The Ninth Circuit, too, has considered the effect of job responsibilities on a federal employee's ability to qualify as an original source, but it has undertaken this inquiry only after determining that there has been a public disclosure. *See United States ex rel. Biddle v. Bd. of Trustees*, 161 F.3d 533, 542–43 (9th Cir.1998) (holding that a government employee with a specific duty to disclose fraud does not "voluntarily" provide information and thus cannot be an original source); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1476 n. 19 (9th Cir.1996) ("*Hagood II*") (holding that a former attorney for the Army Corps of Engineers was an original source, because his "job was not to expose fraud");

*United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 743 (9th Cir.1995) (en banc) (holding that an auditor for the Inspector General was not an original source, because his job was to investigate and report fraud). The Eleventh Circuit has declined to analyze this issue, but rejected the assertion that a federal employee can never be an original source. *Williams*, 931 F.2d at 1501 n. 14. The Tenth Circuit has not had occasion to examine this question, and we find it unnecessary to do so here.

**10.** We emphasize that neither this nor any of the subsequent points in this subsection has dictated the result in this case, particularly not standing alone. Indeed, if we were to accept the proposition that the government's ability to pursue a case in itself precludes a *qui tam* suit, we would simply adopt the reasoning of the district court. These points

Second, an ongoing government investigation demonstrates that the government *is in fact pursuing* the allegations of fraud. This is true even if, until the government actually initiates an enforcement action, there may be uncertainty as to whether it will do so. Holmes participated in the government investigation pursuant to her duties as postmaster. With respect to that investigation, she *is* part of the governmental entity. Her *qui tam* action is not prodding the government to pursue fraud it would not otherwise pursue, because the undisputed facts show that the government is engaged in active pursuit. In fact, Holmes's own brief states plainly that this was *not* the purpose of her suit: "After Relator was confident that the government was adequately investigating her information, she filed her lawsuit under the FCA to recover her lawful share of the proceeds." Therefore, permitting Holmes's *qui tam* suit would not serve this aspect of the FCA's purposes.

Third, these circumstances are not ones in which a private person needs to be encouraged to expose fraud. On the contrary, having acquired the information in the course of her duties as a postmaster, Holmes had a specific obligation as a postmaster to report it. Again we note that, in the performance of her duties as a postmaster, she is part of the governmental entity. As such, she acquired the information for the government. Moreover, a federal employee who reports a private company's fraud on the government does not have the same fear of reprisal that a company insider who acts as a whistleblower may have, further reducing the need for

financial incentives to encourage them to disclose information about fraud.[11]

Finally, allowing federal employees' *qui tam* suits in these circumstances would not serve, and would in fact contradict, Congress's goal of preventing parasitic suits. The purposes we have outlined create a contrast between public and private, between the federal government's information and private citizens' independent knowledge. In *Ramseyer*, we concluded that the public disclosure bar requires actual, not merely theoretical, disclosure. 90 F.3d at 1519. Underlying our reasoning was the assumption that potential *qui tam* relators do not have access to governmental information that has not been made public:

> Information to which the public has potential access, but which has not actually been released to the public, cannot be the basis of a parasitic lawsuit because the relator must base the *qui tam* suit on information gathered from his or her own investigation. If a specific report detailing instances of fraud is not affirmatively disclosed, but rather is simply ensconced in an obscure government file, an opportunist *qui tam* plaintiff first would have to know of the report's existence in order to request access to it.

*Id.* at 1520. This rationale, however, does not apply to government employees who know of the allegations because of their jobs. Government employees frequently have access to government information even though it has not been "publicly disclosed," as defined in *Ramseyer*. Thus, there is a potential for parasitic *qui tam* suits by government employees before "public disclosure" occurs, just as there is a potential for such suits by private persons following public disclosure.[12]

merely illustrate that our holding is consistent with the aims of the statute and the 1986 amendments.

**11.** In addition to the financial incentives for a *qui tam* plaintiff, the statute addresses this particular concern by providing that an employee who suffers retaliatory action as a re-

sult of pursuing or assisting in an action under section 3730 "shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h).

**12.** Again we note that Holmes's own brief evidences a specific intent to piggyback on the government's efforts.

### 3. Conflict of Interest

Federal employees' obligations to avoid conflicts of interest further distinguish them from others who file *qui tam* suits. The glaring inconsistency between these limitations on federal employees and allowing federal employees to pursue *qui tam* suits further supports our conclusion that Congress did not intend to permit federal employees to act as *qui tam* plaintiffs in these circumstances.

The most relevant among the specific prohibitions on federal employees is the prohibition on the use of "nonpublic Government information"[13] to "further any private interest." 5 C.F.R. §§ 2635.101(b)(3), 2635.703(a). Other regulations prohibit participation in a government matter in which the employee has a financial interest, *id.* §§ 2635.402, 2635.501, 2635.502; the use of public office for private gain, *id.* §§ 2635.101(b)(7), 2635.702; the use of government property or time for personal purposes, *id.* §§ 2635.704, 2635.705; and holding a financial interest that may conflict with the impartial performance of government duties, *id.* § 2635.403. Moreover, Congress

has specifically imposed criminal penalties on government employees who participate in matters in which they have financial interests. 18 U.S.C. § 208.

Holmes has based her *qui tam* suit on information that she acquired in the course of her employment as a postmaster and had a specific duty to disclose. At least while the government is conducting an ongoing investigation of the allegations, Holmes's claim for a portion of the proceeds directly reduces the amount that the government may ultimately collect. To allow an employee in Holmes's position to pursue *qui tam* claims in these circumstances would give a personal stake in the relevant information to any individual whose duties include reporting fraud. "Rather than perform their jobs as they are required, government employees obligated to disclose suspected fraud may inappropriately hide fraud from their supervisors while preparing their *qui tam* actions for filing." *United States ex rel. Biddle v. Bd. of Trustees*, 161 F.3d 533, 542 (9th Cir.1998) (citation omitted). We cannot conclude that Congress intended to create an incentive for government employees to withhold information about suspected fraud contrary to their specific employment obligations.[14]

**13.** "Nonpublic information" means "information that the employee gains by reason of Federal employment and that he knows or reasonably should know has not been made available to the public." 5 C.F.R. § 2635.703(b).

**14.** We contrast our reasoning here with the primary policy arguments that the Eleventh Circuit rejected in *Williams* involving administrative difficulties—specifically, interference with the government's case and premature disclosure of allegations to defendants. 931 F.2d at 1503. We agree that these concerns do not require excluding government employees from the class of eligible *qui tam* plaintiffs, and we accord them no weight. The statute demonstrates that Congress considered these concerns (though not specifically with respect to government employees) and chose to mitigate them by other means. 31 U.S.C. § 3730(b)(2)-(3) (requiring that a *qui*

*tam* plaintiff file the complaint under seal, and allowing the government to seek an extension of the 60–day period during which the complaint remains under seal); (b)(4) (allowing the government to take over a *qui tam* action by intervention); (c) (limiting the *qui tam* plaintiff's rights when the government intervenes).

The *Williams* court, although it noted the government's argument that "the False Claims Act should not allow a personal reward to government employees for the 'parasitical' use of information obtained and developed in the course of government employment," 931 F.2d at 1503, did not consider the plaintiff's particular employment obligations in this context. Such obligations are an important aspect of our analysis of Holmes's case. Moreover, to the extent that we rely upon the obligation of federal employees, we use these to in-

The FCA does not specify how it applies to federal employees. We must assume that Congress intends for federal employees to adhere to applicable statutes and regulations. We have therefore endeavored to construe the FCA in a manner that is consistent with federal employees' obligations. In light of these obligations, along with the statute's evident purposes and its distinction between the government and the private relator, we conclude that Congress did not intend to permit a federal employee's *qui tam* suit in these circumstances.

### III. Conclusion

Allowing jurisdiction in this case would ignore the statute's distinction between the government and the *qui tam* plaintiff. It would be directly contrary to the purpose of discouraging parasitic lawsuits and would serve none of the Act's other purposes. Moreover, it would conflict with Holmes's obligations as a postmaster employed by the federal government. We therefore hold that Holmes is not a proper relator under the FCA, and the district court properly dismissed her from the case.

We emphasize, however, that we do not hold that federal employees can never be *qui tam* plaintiffs. For example, a contrary conclusion may be appropriate in a case in which the government has abandoned its investigation and there has been no public disclosure. The employee would no longer be part of a government investigation, and allowing the suit in those circumstances would serve the statutory purpose of revealing to the public and prosecuting fraud that the government has failed to pursue. Assuming that the employee had fulfilled all employment ob-

ligations relating to the fraud allegations, there would be no conflict of interest. We also note that, if the government should choose to intervene in such an action, the statute requires the court to limit the *qui tam* plaintiff's recovery to a maximum of 10% of the proceeds if "the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the persons bringing the action)" in certain government sources or the news media. 31 U.S.C. § 3730(d)(1). A different analysis may also be appropriate when a federal employee, much like the typical whistleblowing insider in a private company, acts as an insider to expose another federal employee's (particularly a direct superior's) fraud against the government. The employee's specific employment duties and how the employee learned of the fraud would affect the determinations of whether the employee acted as the government in reporting it, whether it is the sort of disclosure for which Congress intended to provide incentives, and whether allowing the suit would be contrary to conflict of interest principles. While it is beyond the scope of this opinion to consider all the situations that might compel a result different from the one we have reached here, we mention these examples to illustrate the limitations of our holding.

For the foregoing reasons, we AFFIRM the district court's dismissal of Holmes from the suit for lack of subject matter jurisdiction.

BRISCOE, Circuit Judge, dissenting:

I respectfully dissent. I would reverse the district court and remand for further

---

form our interpretation of the statutory language in section 3730(b)(1). We thus disagree with the Eleventh Circuit's statement that "[t]he False Claims Act is devoid of any statutory language that indicates a jurisdictional bar against government employees as *qui tam* plaintiffs." *Williams,* 931 F.2d at 1504.

proceedings. I agree with the majority that the district court erred in concluding the existence of an ongoing government investigation operates as a per se bar to a qui tam suit, and that the government's investigation in this case did not result in a "public disclosure" within the meaning of 31 U.S.C. § 3730(e)(4)(A). However, I disagree with the majority's conclusion that Holmes is precluded from pursuing this lawsuit. More specifically, I disagree with the majority's interpretation of the general qui tam provision of the False Claims Act (FCA), 31 U.S.C. § 3730(b)(1), as prohibiting a "federal employee who is part of an ongoing government investigation" from proceeding with a qui tam suit. Maj. Op. at 1251.

### I.

"The FCA sets out civil and criminal penalties for persons who knowingly submit false claims to the government." *United States ex. rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 738 (3d Cir. 1997); *see also Avco Corp. v. United States Dept. of Justice*, 884 F.2d 621, 622 (D.C.Cir.1989) (FCA "is the government's primary litigative tool for the recovery of losses sustained as the result of fraud against the government."). "A private person with knowledge of fraud against the government, acting as a de facto 'attorney general,' can instigate litigation on the government's behalf against the parties responsible. Such suits are known as qui tam actions." *Dunleavy*, 123 F.3d at 738. The FCA provides a built-in incentive for such plaintiffs, who are known as relators, to bring suit. *Id.* Specifically, the FCA provides that the relator shall, depending upon the circumstances of the case, receive between 10 and 30 percent of the proceeds of the action, plus reasonable expenses, fees, and costs. 31 U.S.C. § 3730(d)(1), (2).

Precisely who can qualify as a relator under the FCA's qui tam provisions has varied over the years, due in part to shifts in judicial interpretations generating, and sometimes generated by, statutory amendments to the qui tam provisions. As originally enacted in 1863, the FCA "contained broad qui tam provisions that permitted any person to prosecute a claim on behalf of the government and receive half of the amount recovered." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1162 (3d Cir.1991) (dissenting opinion). In 1943, the Supreme Court interpreted these provisions in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), and held that an individual could maintain a qui tam action under the FCA based solely on information copied from a government criminal indictment. Rejecting the government's argument that a broad reading of the qui tam provisions "might bring unseemly races for the opportunity of profiting from the government's investigations," the Court held that the plain language of the qui tam provisions allowed for a suit based solely on public information, and noted that Congress was the proper body to change or eliminate the FCA's qui tam provisions. *Id.* at 547, 63 S.Ct. 379.

Congress responded immediately to the decision in *Marcus*, amending the FCA's qui tam provisions to prohibit qui tam suits that were " 'based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.' " *See Stinson*, 944 F.2d at 1163 (quoting 31 U.S.C. § 232(C) (1982) (superseded)). This new language, however, created problems of its own. "For example, in *United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir.1984), a state government was not allowed to maintain a qui tam action based on information it had gathered in its own investigations, because the state had supplied the government

with the information prior to instituting its action." *Id.* In 1984, "the National Association of Attorneys General strongly urged Congress to rectify the problem encountered in *Dean.*" *Id.* Congress subsequently amended the FCA in 1986 "to permit qui tam suits based on information in the Government's possession, except where the suit was based on information that had been publicly disclosed and was not brought by an original source of the information." *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (citing 31 U.S.C. § 3730(e)(4)(A)). The relevant text of the amendments provides:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A), (B). In sum, the amendments reflect Congress' attempt to find "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 649 (D.C.Cir.1994).

We have held that "[s]atisfaction of the provisions of 31 U.S.C. § 3730(e)(4) is a question of subject matter jurisdiction." *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1003 (10th Cir.1996). Generally speaking, the jurisdictional inquiry under § 3730(e)(4) involves four questions: (1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act; (3) whether the relator's complaint is "based upon" this "public disclosure"; and, if so, (4) whether the relator qualifies as an "original source" under section 3730(e)(4)(B). *Id.* at 1004. If the answer to any of the first three questions is "no," the jurisdictional inquiry ends and the qui tam action proceeds, regardless of whether the relator is an original source. The last inquiry, whether the relator is an original source, is necessary only if the answers to each of the first three questions is "yes," indicating the relator's complaint is based upon a specified public disclosure. *See United States ex rel. Precision Co. v. Koch Indus., Inc.,* 971 F.2d 548, 552 & n. 2 (10th Cir. 1992).

II.

In concluding that it lacked subject matter jurisdiction over Holmes' qui tam claims, the district court acknowledged, but did not ultimately apply, the four-part inquiry outlined above. According to the district court, the four-part inquiry is applicable only "where the government is not actively investigating the alleged wrongdoing." App. at 125. The court concluded that the purpose of the four-part inquiry under such circumstances is to determine "whether the government is 'capable' of pursuing the suit itself." *Id.* In situations where the "government is actively pursuing the alleged wrongdoing when the qui

tam action is sought," the four-part inquiry is unnecessary "because it is clear that the government has already identified the problem." *Id.* (internal quotation and citation omitted). Applying this analytical framework, the court concluded that it lacked subject matter jurisdiction over Holmes' qui tam claims:

> In this case, it is undisputed that, prior to the filing of the qui tam complaint by Holmes, the OIG [Office of Inspector General] and PIS [Postal Inspection Service] were involved in an active administrative investigation of the matters at issue in this suit and had identified the probable offenders. When the investigation substantiated fraud by CIG, Holmes was publicly commended and received a $500 bonus from her employer for her service. In July of 1998, prior to the filing of Holmes' Complaint, the matter was referred to the Attorney General's office and accepted for civil action. Between 1998 and the time the Complaint was filed, the Attorney General's office continued to build a case against CIG. Because the PIS and OIG investigation and their subsequent referral of the matter to the Attorney General set the government "squarely on the trail of the alleged fraud," *Advanced Sciences*, 99 F.3d at 1004, it would therefore "be contrary to the purposes of the FCA to exercise jurisdiction over [the relator's] claim." *Id.* Because my fundamental task in interpreting the FCA is "to give effect to the intent of Congress," *American Trucking Ass'ns*, 310 U.S. at 542, 60 S.Ct. 1059, I must grant the United States' Motion to Dismiss Holmes. It makes no difference that Holmes, as part of her role as postmaster, initially alerted the PIS and OIG to the alleged wrongdoing and spurred them to investigate.

*Id.* at 126.

The district court's analysis is clearly flawed. Contrary to its conclusions, appli-cability of the four-part jurisdictional inquiry set forth in § 3730(e)(4) does not hinge upon whether the government is actively involved in an investigation of the alleged fraud. Rather, the four-part jurisdictional inquiry is applicable in all cases filed by qui tam relators and, as outlined above, subject matter jurisdiction hinges upon the outcome of the four-part inquiry. Although the presence or absence of an ongoing government investigation is relevant in applying the four-part inquiry, it is clearly not the determinative factor. Under the district court's analytical framework, a prospective relator would have to report his or her information to the government and then immediately file suit in an attempt to act before the government instituted an investigation into the allegations. Further, the district court's analytical framework is contrary to Congressional intent in that it could end up preventing persons with legitimate, inside knowledge of wrongdoing from pursuing a qui tam action.

### III.

Obviously recognizing the deficiencies in the district court's analysis, the government asks us to affirm the district court's judgment on one of two alternate grounds. First, the government suggests that Holmes cannot qualify as a relator because the government investigation resulted in a "public disclosure" and Holmes does not qualify as an "original source." Second, the government offers various public policy reasons why it would be inappropriate to allow Holmes to proceed as a relator in this action.

*Public disclosure/original source*

Focusing on parts two and four of the jurisdictional inquiry, the government argues that a "public disclosure" occurred when government investigators questioned the one current (Jim Benbrook) and two

former (Cameron Benton and Henry Modrejewski) CIG employees,[1] and, in any event, Holmes does not qualify as an "original source" because she was obligated to report the alleged fraud (and thus did not "voluntarily" report it).

The term "public disclosure" is not defined in the FCA. In *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1519 (10th Cir.1996), we held that the term "signifies more than the mere theoretical or potential availability of information." "[I]n order to be publicly disclosed, the allegations or transactions upon which a qui tam suit is based must have been made known to the public through some affirmative act of disclosure." *Id.* Thus,

> [t]he mere possession by a person or an entity of information pertaining to fraud, obtained through an independent investigation and not disclosed to others, does not amount to "public disclosure." Rather, public disclosure occurs only when the allegations or fraudulent transactions are affirmatively provided *to others not previously informed thereof.*

*Id.* at 1521 (emphasis added).

Applying these principles to the case at hand, it is clear that a public disclosure did not occur when, during the course of their administrative investigation, government investigators questioned Benbrook, Ben-

ton, and Modrejewski. It is uncontroverted that these three individuals participated, to one degree or another, in the alleged fraudulent scheme and thus were "previously informed" of the fraudulent scheme prior to their respective interviews with government investigators.[2]

The government concedes "there is some support" in *Ramseyer* and its progeny for the notion that, in order for there to be a public disclosure, the recipient of the disclosed information must be a stranger to the fraud. Gov't Br. at 22. Notwithstanding this concession, however, the government attempts to distinguish these cases by arguing that they "do not address the different situation where there have been no disclosures to strangers to the fraud, but the Government is fully aware of the allegations and is actively pursuing its own investigation." *Id.* Although its argument is not exactly clear, it appears the government is effectively asking us to modify the "public disclosure" test if the government is aware of the allegations, actively pursuing an investigation into the allegations, and responsible for the disclosure(s).

Although it is unclear precisely how the government would modify the "public disclosure" test in such circumstances, it argues that, at a minimum, its "disclosures to the two former CIG employees [Benton

---

**1.** Although it is uncontroverted that a number of postal employees were also interviewed during the course of the administrative investigation, the government makes no attempt to assert that these resulted in a "public disclosure" of the allegations at issue. Indeed, the government concedes that its "disclosures to former and current employees of CIG ... have always been the sole basis for application of the public disclosure bar in this case." Govt. Br. at 37.

**2.** Benbrook "transported many of the mailings at issue from CIG to the Howard post office" and "submitted false certifications to

the Howard post office in order to qualify the CIG bulk mailings for the lower postage rates." Pltf's Br. at 8. Benton had talked to Holmes about a bulk mailing in October 1995, and he was aware "that CIG's bulk mailings did not qualify for the lower postage rates CIG was receiving from the Howard post office." *Id.* at 9. Modrejewski "accompanied ... Benton during the visit to the Poncha Springs post office" in October 1995, and "knew that the rates for CIG's bulk mailing quoted by [Holmes] ... were higher than the rates CIG was receiving from the Howard post office." *Id.*

and Modrejewski] during its investigation [in this case] should trigger the public disclosure bar, even though it turned out that they were not strangers to the fraud." *Id.* at 34. The government does not clearly explain, however, why the disclosure to these former employees should be deemed sufficient to constitute a "public disclosure." Apparently, the government finds significant the fact that they no longer work for the defendant. However, the government offers no principled distinction between them and the one man (Benbrook) who still worked for the defendant, since all three men had prior knowledge of the alleged wrongdoing. Further, the government cites no case where a court has held that a disclosure to a person familiar with the fraud constitutes a "public disclosure" for purposes of § 3730(e)(4).

The government makes several other arguments in an effort to demonstrate why a "public disclosure" has occurred within the meaning of § 3730(e)(4). Citing *United States ex. rel Doe v. John Doe Corp.*, 960 F.2d 318 (2d Cir.1992), the government suggests that "the Second Circuit has squarely held that disclosures made by the Government to employees of a defendant corporation during the course of a fraud investigation constitute public disclosures under section 3730(e)(4)(A)." Gov't Br. at 21. A review of the *John Doe* decision, however, demonstrates that the Second Circuit's holding is not as broad as described by the government. In concluding

that a public disclosure had occurred within the meaning of § 3730(e)(4)(A), the Second Circuit focused not on the fact that the government had generally disclosed information to the defendant's employees, but rather that the disclosures had been made to many employees who were innocent and knew nothing about the defendant's wrongdoing:

> Here, ... the allegations of fraud were not just potentially accessible to strangers, they were actually divulged to strangers to the fraud, namely the innocent employees of John Doe Corp. While the search warrant was being executed, the investigators spoke to numerous employees of John Doe Corp., some of whom knew of the fraud. But, more importantly, many of these individuals knew nothing about defendants' ongoing scheme; they were strangers to the fraud. These people were neither targets of the investigation nor potential witnesses. The government may have hoped that these individuals were potential witnesses, but it is clear that they were not.

960 F.2d at 322–23.[3] Thus, contrary to the government's assertions, the decision in *John Doe* supports the conclusion that no public disclosure occurred in this case when the government interviewed persons who were involved in, or had prior knowledge of, the alleged wrongdoing.[4]

---

**3.** An argument can be made that the majority decision in *John Doe* was wrong, and that questioning so-called "innocent" employees of a company suspected of wrongdoing does not constitute "public disclosure" for purposes of the FCA. It is unnecessary to decide the issue, however, in light of the fact that all three witnesses at issue in this case had prior knowledge of the fraud.

**4.** The government makes a similar, overly broad characterization of this court's decision in *United States ex rel. Fine v. Advanced Sci-*

*ences, Inc.*, 99 F.3d 1000 (10th Cir.1996). *See* Gov't Br. at 21 ("Likewise, this Court has made clear that a disclosure of allegations to even a single person outside the Government will trigger the jurisdictional bar."). Although it is true that the court in *Advanced Sciences* concluded that a "public disclosure" had occurred based upon the disclosure of information to a single individual, a key aspect of that conclusion was that the individual to whom the information was disclosed was "previously unconnected with the alleged fraud." 99 F.3d at 1005.

One other aspect of *John Doe* requires mention. Throughout its "public disclosure" discussion, the government repeatedly cites *John Doe* for the proposition that the purpose of the "public disclosure" test "was 'to prod the government into action, rather than allowing it to sit on, and possibly suppress, allegations of fraud when inaction might seem to be in the interest of the government.'" Gov't Br. at 25 (quoting *John Doe*, 960 F.2d at 323). Although the quotation is accurate (as far as it goes), a careful review of the *John Doe* decision demonstrates that the government misconstrues what the court said. Importantly, the language quoted by the government does not refer to the "public disclosure" test implemented by the 1986 amendments, but rather to the 1986 amendments in general. *See* 960 F.2d at 323 ("One reason for the 1986 amendments was to prod the government into action."). On that point, the Second Circuit was absolutely correct: "prodding" the government into action was obviously Congress' impetus for jettisoning the pre–1986 "government knowledge" standard, under which qui tam actions were barred if the federal government already possessed information upon which a qui tam action was based. That does not mean, however, that the purpose of the "public disclosure" test was the same. Rather, a review of the amendments and the legislative history makes clear that the purpose of the "public disclosure" test was to help identify and prevent "parasitic" qui tam actions (which Congress, consistent with its 1943 amendments, continued to want to limit).[5]

The government suggests that if its position is not accepted by the court, it will be forced "to make disclosures of relevant allegations to 'innocent' third parties in order to satisfy the public disclosure bar—and ensure that opportunistic qui tam suits will be barred." Gov't Br. at 31. This argument is without merit. If there has been no public disclosure of information, then, per se, there can be no parasitic lawsuits. Stated differently, if a qui tam action is filed prior to any public disclosure, there is obviously a reasonable presumption that the information on which the relator's suit is based was personally obtained by the relator.

The government complains that a rule requiring disclosure "to individuals with no prior knowledge of the fraud would necessitate a bizarre mini-trial concerning the state of mind of various witnesses." Gov't Br. at 31–32. Obviously, a court faced with a public disclosure question may have to make factual findings regarding when and to whom a disclosure occurred. Nothing in the FCA suggests this is inappropriate. In any event, nothing of the sort was required in this case where the government has conceded that the three witnesses at issue were all involved in, or at least had prior knowledge of, the alleged wrongdoing.

---

**5.** The government makes several arguments that are tied to its mischaracterization of the *John Doe* quotation. For example, the government argues that "[i]n cases where there is no evidence that the Government is aware of fraud allegations prior to a qui tam filing, ... determining whether a disclosure of fraud allegations has been made to at least one individual 'not previously informed thereof' is a reasonable proxy for assessing whether the Government will be made aware of the allegations—and feel some pressure to act on them—even without the impetus of a qui tam suit." Gov't Br. at 30. However, the point of the public disclosure requirement is not to determine whether there is an impetus for the government to take action—the filing of the qui tam lawsuit takes care of that. Rather, the point of the public disclosure test is to determine whether the qui tam lawsuit is a parasitic one.

The government also repeatedly suggests that "the sole purpose of looking for a disclosure is to determine if the Government is already on the trail of the fraud." Govt. Br. at 39. This is clearly incorrect.

Finally, the government argues that the "stranger-to-the-fraud" test "is flawed on its own terms because not all 'strangers' have incentives to disseminate information about fraud, and some individuals who have prior knowledge of fraud may have compelling incentives not to further publicize it." *Id.* at 33. Although the government is undoubtedly correct that there will always be exceptions to the rule (as far as a particular person's willingness to disseminate information), the "stranger-to-the-fraud" rule is obviously based on generalities. Moreover, the government has not offered a convincing test that could adequately replace the "stranger-to-the-fraud" rule. In any event, we are bound by prior precedent and thus are not free to ignore the "stranger-to-the-fraud" concept.

Because no "public disclosure" occurred prior to the filing of Holmes' qui tam action, it is unnecessary to determine whether Holmes was an "original source" of the information upon which her complaint was based. As previously discussed, where, as here, a public disclosure did not occur, the jurisdictional inquiry comes to an end and the qui tam action proceeds, regardless of whether the relator qualifies as an original source.

*Public policy*

In a fall-back argument, the government offers several public policy reasons why federal employees should not be allowed to maintain qui tam actions based upon information obtained during the course of their employment. According to the government, "[p]ermitting Holmes to pursue a qui tam action on the facts here would be inconsistent with her specific duty as a United States Postmaster to report fraud and with numerous legal duties imposed on all federal employees." Gov't Br. at 43. For example, the government argues, permitting Holmes to proceed as a relator would be contrary to federal regulations prohibiting "the use of public office for private gain," "the use of Government property or time for personal purposes," "the use of 'nonpublic Government information' to further private interests," and "the holding of any financial interests that may conflict with the impartial performance of Government duties." *Id.* at 44–45. The government further argues that "there is no intent expressed in the [FCA] to permit qui tam suits by federal employees whose job it is to report fraud when they encounter it," and in fact "the legislative history of the 1986 amendments to the FCA reveals an intent to 'encourage more private enforcement suits,' ... not to encourage suits by public employees seeking to capitalize on information learned during the course of their federal employment." *Id.* at 45. Finally, the government argues that "permitting qui tam suits by federal employees who are already under an obligation to disclose fraud would, as a practical matter, create perverse incentives for Government employees." *Id.* at 45–46.

Although the government's arguments are not without merit, we must not lose sight of the fact that nothing in the FCA expressly precludes federal employees from filing qui tam suits. Prior to 1986, the FCA "precluded jurisdiction where the action was based upon information in the possession of the United States or any of its employees at the time of the suit." *United States ex rel. Burns v. A.D. Roe Co.,* 186 F.3d 717, 722 n. 5 (6th Cir.1999). Thus, "government employees were effectively prohibited from bringing claims under the qui tam provision." *Id.* The 1986 amendments to the FCA, however, revised the qui tam provision to allow any "person" to bring such a suit. *See id.;* 31 U.S.C. § 3730(b). "It is not clear whether Congress intended by the amendments to allow government employees to bring suit," *Burns,* 186 F.3d at 722 n. 5, since nothing in the amendments or the legislative history thereto addresses the issue.

Indeed, it appears that Congress did not give any thought to the issue at the time it formulated and enacted the 1986 amendments. *See* Major David Wallace, *Government Employees as Qui Tam Relators,* 1996–AUG Army Law. 14, 22 (1996) ("The sponsors of the 1986 FCA amendments simply did not contemplate the issue of government employees using information they learned in the course of their duties as the basis of lawsuits in their own names."); Patrick W. Hanifin, *Qui Tam Suits by Federal Government Employees Based on Government Information,* 20 Pub. Cont. L.J. 556, 570–71 (1991) ("The legislative history does not expressly resolve the question of whether Congress intended to permit federal source suits. This is an instance where determining what Congress thought about an issue is difficult because Congress never thought about the issue, or at least did not express itself clearly.").

Post 1986 congressional activity suggests that Congress views the FCA as allowing federal employees to file qui tam actions. "In 1990, the Subcommittee on Administrative and Governmental Relations of the House Judiciary Committee held the first oversight hearings on the Act." Virginia C. Theis, *Government Employees as Qui Tam Plaintiffs: Subverting the Purposes of the False Claims Act,* 28 Pub. Cont. L.J. 225, 238 (1999). During those hearings, "[t]he Justice Department, the Inspector General of the Department of Health and Human Services, and John R. Phillips, an attorney who participated in drafting the amendments ..., proposed limits on federal employees seeking to bring [FCA] actions." *Id.* "In 1992, Congress introduced two bills intended, in part, to address the issue of government employee relators." Wallace, *supra,* at 22. The first of the bills, H.R. 4563, "would have established limitations on government employees who file[d] qui tam suits based on information gained during the course of

their employment." Theis, *supra,* at 238–39. The second bill, S. 2785, proposed banning "all qui tam suits brought by government employees who base[d] their actions on information obtained during the course of their government employment." Wallace, *supra,* at 23. Both bills had critics, and neither were ultimately passed into law.

Consistent with this history, "no court has accepted the argument that government employees per se can never be relators in a qui tam action." *Burns,* 186 F.3d at 722 n. 5. Although some judges from the Ninth Circuit have criticized the practice of allowing federal employees to bring qui tam actions, *see United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 747, 749 (9th Cir.1995) (Trott, J., and Hawkins, J., concurring), that court has, at least in one instance, allowed a federal employee to proceed as a relator in a qui tam action. *See Hagood v. Sonoma Co. Water Agency,* 81 F.3d 1465, 1476 (9th Cir.1996). Likewise, the First Circuit has held that § 3730(e)(4)(A) does not per se "prevent government employees from bringing qui tam actions based on information acquired during the course of their employment." *United States ex rel. LeBlanc v. Raytheon Co.,* 913 F.2d 17, 20 (1st Cir.1990).

In my view, the most persuasive discussion of the issue comes from the Eleventh Circuit's decision in *United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493 (11th Cir.1991). There, the relator was an attorney for the United States Air Force who, "[d]uring the course of his employment with the government, ... became aware of bidrigging on the part of a corporation seeking telecommunications contracts with the United States." *Id.* at 1494. The district court dismissed the suit on the grounds that the FCA contained a jurisdictional bar against suits brought by government employees based

upon information acquired in the course of their employment. On appeal, the court initially determined that no public disclosure had occurred prior to the relator filing suit, and thus concluded that it was unnecessary for the relator to establish that he was an "original source" of the information on which his suit was based. *Id.* at 1499–1501. The court then rejected the government's argument that "the comprehensive bar against qui tam suits by government employees in the 1943 version of the [FCA] was never repealed by the 1986 amendments." *Id.* at 1501. In particular, the court concluded that "[t]he structure of the 1986 version of the Act and several basic canons of statutory interpretation make it clear that no such general prohibition any longer exists." *Id.* at 1502. Finally, the court rejected various public policy arguments forwarded by the government "for finding that Congress intended to bar government employees from initiating qui tam suits based upon information acquired in the course of their government employment." *Id.* at 1503. Specifically, the court held:

> We recognize that the concerns articulated by the United States may be legitimate ones, and that the application of the False Claims Act since its 1986 amendment may have revealed difficulties in the administration of qui tam suits, particularly those brought by government employees. Notwithstanding this recognition, however, we are charged only with interpreting the statute before us and not with amending it to eliminate administrative difficulties. The limits upon the judicial prerogative in interpreting statutory language were well articulated by the Supreme Court when it cautioned:

> > Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive. The natural meaning of words cannot be displaced by reference to difficulties in administration. For the ultimate question is what has Congress commanded, when it has given no clue to its intentions except familiar English words and no hint by the draftsmen ·of the words that they meant to use them in any but an ordinary sense. The idea which is now sought to be read into the [Act] ... is not so complicated nor is English speech so poor that words were not easily available to express the idea or at least to suggest it.

> *Addison v. Holly Hill Fruit Prods.,* [322 U.S. 607, 617–18, 64 S.Ct. 1215, 88 L.Ed. 1488] (1944). Congress could have certainly indicated its desire to prevent government employees from filing qui tam suits based upon information acquired in the course of their government employment. The False Claims Act is devoid of any statutory language that indicates a jurisdictional bar against government employees as qui tam plaintiffs. We also note an absence of any clear indication that Congress intended such a bar to be implied in spite of the plain language of the statute. Therefore, we decline to judicially create an exception where none exists.

*Id.* at 1503–04 (internal footnotes and quotations omitted).

For these same reasons, I reject the government's public policy arguments and decline to hold that government employees are per se precluded from filing qui tam actions based upon information obtained during the course of their employment. Although there may be sound public policy reasons for limiting government employees' ability to file qui tam actions, that is Congress' prerogative, not ours.

## IV.

The majority, using the government's public policy arguments as a stepping stone, seeks to accomplish what Congress itself has been unable to do since the 1986 amendments, i.e., limit the ability of government employees to file qui tam actions based upon information obtained during the course of their employment. More specifically, the majority effectively amends the FCA's general qui tam provision by interpreting the word "person," as used in 31 U.S.C. § 3730(b)(1),[6] to exclude any government employee who "is part of an ongoing government investigation of fraud allegations" from pursuing a qui tam suit "based on those allegations." Maj. Op. at 1248. In my view, this is improper.

To begin with, the majority fails to offer any justification for adopting and applying its own unique interpretation of the word "person," as used in § 3730(b)(1). Neither party has asked us to interpret this statute. Admittedly, the FCA does not specifically define the word "person." However, that does not mean the word is ambiguous, at least with respect to the extent that it encompasses individuals. As the Supreme Court has noted, a statute is ambiguous if it is "capable of being understood in two or more possible senses or ways." *Chickasaw Nation v. United States,* 534 U.S. 84, ——, 122 S.Ct. 528, 533, 151 L.Ed.2d 474, —— (2001) (internal quotation omitted). While it might reasonably be argued that the word "person" either includes or excludes certain entities, there can be no doubt that it encompasses all human beings, including government employees. *See Black's Law Dictionary* 1142 (6th

ed.1990) (defining "person" as "a human being (i.e. natural person)," but noting that "by statute [the] term may include labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers"). Stated differently, it cannot plausibly be argued that the word "person" is reasonably capable of being construed as excluding government employees in general, or specific government employees in particular. Thus, the interpretation ultimately adopted by the majority cannot be classified as a "normal" or "everyday" meaning of the word "person." *E.g., Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").

The majority has not invoked § 3730(b)'s title, "Actions by private persons," nor could it legitimately do so. As the Supreme Court has pointed out, the title of a statutory provision "cannot limit the plain meaning of the text," and instead can only be used "when [it] shed[s] light on some ambiguous word or phrase." *Pennsylvania Dept. of Corr. v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (internal quotation omitted). Even assuming the word "person" was ambiguous (which it is not), employment of § 3730(b)'s title could only lead to one of two conclusions: either that all government employees fall within the class of "persons" capable of filing suit under the qui tam provisions, or that all government employees fall outside of that class.[7] *See Black's Law Dictionary* 1196 (indicating

---

**6.** That provision provides, in pertinent part, that "[a] person may bring a civil action for a violation of [the False Claims Act] for the person and for the United States Government."

**7.** Although the majority disclaims any reliance on § 3730(b)'s title, it nevertheless sug-

gests "it would be quite plausible to interpret" the title to distinguish between what the majority refers to as "insider actions" filed by government employees against other government employees, and "non-insider actions based on information obtained in the course of government employment." Maj. Op. at

"private person" is a "[t]erm sometimes used to refer to persons other than those holding public office or in military services"). Adoption of the latter conclusion would render superfluous the specific exclusions adopted by Congress in 31 U.S.C. § 3730(e)(1) (prohibiting "former or present member[s] of the armed forces" from filing qui tam actions "against a member of the armed forces arising out of such person's service in the armed forces").

Nor can the majority's interpretation rest upon the "scrivener's error" doctrine. Under the doctrine of "scrivener's error," a court may "give an unusual (though not unheard-of) meaning to a word which, if given its normal meaning, would produce an absurd and arguably unconstitutional result." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 82, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (Scalia, J., dissenting). Although there may be valid public policy reasons why certain government employees should be precluded from availing themselves of the qui tam provisions of the FCA, it cannot be said that defining the word "person" as encompassing all individuals, including government employees, would produce an "absurd and arguably unconstitutional result." Nor can it be said that the interpretation adopted by the majority was "genuinely intended [by Congress] but inadequately expressed." *Id.* It appears that in enacting the 1986 amendments to the FCA, Congress simply did

not consider the question of whether government employees should be allowed to use information obtained in the course of their employment as the basis for a qui tam action. Thus, by interpreting the word "person" as it does, the majority ends up "rewriting the statute rather than correcting a technical mistake." *Id.*

The majority suggests the First Circuit adopted a somewhat similar interpretation in *LeBlanc.* A review of *LeBlanc,* however, demonstrates that the First Circuit's holding was dramatically different than the majority's in this case. Rather than interpreting the word "person," as used in § 3730(b)(1), the First Circuit was asked to interpret the "public disclosure" language contained in § 3730(e)(4)(A) and the definition of "original source" contained in § 3730(e)(4)(B). 913 F.2d at 20. With respect to the "public disclosure" provision, the First Circuit concluded that it "bar[red] government employees, as well as private citizens, from bringing qui tam actions only if the information forming the basis of the action was acquired in the circumstances described in 31 U.S.C. § 3730(e)(4)(A)." *Id.* Notably, the First Circuit held that the provision "does not prevent government employees from bringing qui tam actions based on information acquired during the course of their employment but not as the result of a government hearing, investigation or audit or through the news media."[8] *Id.* As for

1266 n. 7. In my view, this proposed distinction is implausible. In either scenario, the potential relator obtains the information in the course of his or her government employment. The only practical distinction between the two scenarios is the perpetrator of the fraud (i.e., another government employee vs. a non-government employee or entity). Precisely how the status of perpetrator of the fraud could affect the potential relator's status as a "private person" is not explained.

8. Although the majority contends the First Circuit concluded "there had been no public

disclosure" in that case, Maj. Op. at 1268 n. 9, that is not clear from the opinion. *See* 913 F.2d at 20 (discussing meaning of "public disclosure" provision but failing to specify whether a "public disclosure" had actually occurred in the case before it). Given the court's subsequent discussion of the "original source" provision, it is fair to presume the court concluded that a "public disclosure" had occurred, thus triggering the requirement that the relator qualify as an "original source." *See Id.*

the "original source" provision, the First Circuit concluded that a government employee, whose job responsibilities included uncovering fraud, could not qualify as an "original source" if the information that formed the basis of his qui tam action was obtained in the course of fulfilling those job responsibilities. *Id.* In sum, the First Circuit's holdings prohibit certain government employees from qualifying as "original sources," and thereby acting as qui tam relators, where there has been a "public disclosure" as described in 31 U.S.C. § 3730(e)(4)(A).[9] That is a far cry from rewriting the general qui tam provision of § 3730(b)(1) to limit the class of "persons" who may bring suit.

In sum, the majority's decision is contrary to the plain language of § 3730(b)(1) and ordinary rules of statutory interpretation. According to the majority, "a federal employee who participates in a government investigation pursuant to her job duties is not, at least while the investigation is ongoing, a 'person' entitled to bring a civil action under section 3730(b)." Maj. Op. at 1251. Although this might be an acceptable legislative choice, nothing in the FCA or the other sources cited by the majority (e.g., the federal regulation governing federal employees' use of "nonpublic Government information") mandates this exclusion. It is my view that "only Congress can correct . . . oversights of the kind" arguably presented here. *Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 142, 115 S.Ct. 1278, 131 L.Ed.2d 160 (1995) (Ginsburg, J., concurring).

Nor am I persuaded that any of the additional rationale offered by the majority justify its decision. For example, the majority suggests, mistakenly in my view, that exercising jurisdiction in this case "would be contrary to the FCA's purpose of preventing parasitic suits." Maj. Op. at 1256. The paradigmatic "parasitic suit" occurs when a person, otherwise unfamiliar with the situation, learns about the alleged fraud from a public disclosure and then attempts to file suit and capitalize on that information. It is uncontroverted that Holmes had direct knowledge of the alleged fraud and was the person who "blew the whistle" by notifying government investigators. Although there may be public policy reasons for excluding her, as a government employee, from filing suit under the qui tam provisions, her suit is certainly not a "parasitic" one.

Notably, the exclusion carved out by the majority does not eliminate the possibility of what could accurately be classified as parasitic suits in the government setting, i.e., suits by government employees lacking first-hand knowledge of the alleged fraud. Suppose, for example, that after discovering the alleged fraud in this case, Holmes had told a colleague or subordinate about it, and that the colleague or subordinate filed a qui tam action based on the information supplied by Holmes. Because the colleague or subordinate presumably would not be "involved in" any ensuing investigation because of lack of personal knowledge about the fraud, he or she would not be precluded under the majority's holding from filing suit.[10]

---

9. Under the First Circuit's holdings, Holmes would not be excluded from pursuing her qui tam action because there has been no "public disclosure" as set forth in 31 U.S.C. § 3730(e)(4)(A).

10. To the extent the majority claims this cannot occur, its holding would amount to a per se ban on qui tam actions by government employees during the pendency of a government investigation (a holding quite similar to the one adopted by the district court and allegedly rejected by the majority).

The majority also fails to clearly define when a government employee is, in its words, "involved in" a government investigation. Presumably, a government auditor or investigator would be deemed to be "involved in" any investigation in which he or she has a professional responsibility. What about, however, a person such as Holmes who is not employed as an auditor or investigator, but who nevertheless learns about alleged fraud and reports it to her supervisor or to government investigators? Although that person may have precipitated an investigation, is she "involved in" it, thereby precluding her from filing suit? Based upon the majority's holding, the answer to this question appears to be "yes." Doesn't this, however, create a perverse incentive for a government employee to simply file suit under the FCA prior to disclosing the information to any superiors or government investigators?

The majority suggests that Holmes should be precluded from filing suit because "this is a case of fraud allegations that the government *is capable of pursuing*." Maj. Op. at 1256 (emphasis in original). Given the FCA's disclosure requirements, the same can be said for literally any qui tam action. Under 31 U.S.C. § 3730(a)(2), a relator filing a qui tam action must serve on the government "[a] copy of the complaint and written disclosure of substantially all material evidence and information the person possesses." The relator's complaint then remains "under seal for at least 60 days" and is not served "on the defendant until the court so orders." *Id.* After receiving the relator's complaint and evidence, the government has 60 days within which to elect "to intervene and proceed with the action." *Id.* If the government elects to proceed with the action, "it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1).

Finally, the majority suggests that "a federal employee who reports a private company's fraud on the government does not have the same fear of reprisal that a company insider who acts as a whistle-blower may have." Maj. Op. at 1256. Although that may well be true where, as here, there is no indication that government employees participated with private actors in the alleged fraud scheme, that is certainly not always the case. Indeed, the majority recognizes as much when it notes, in its concluding section, that there may be legitimate reasons for allowing a government employee to file a qui tam action when his or her supervisor is involved in the alleged fraud. The possibility of these differing scenarios reinforces why this is a matter for Congress, rather than this court, to decide.

I would reverse the decision of the district court and remand for further proceedings.